UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------------X

BASIL WILLIAMS and PETER PERNA, on behalf of themselves and all those similarly situated,

Plaintiffs,

-against-

THE CITY OF NEW YORK, DEPARTMENT OF CORRECTION COMMISSIONER LYNELLE MAGINLEY-LIDDIE, SENIOR DEPUTY COMMISSIONER FRITZ FRAGE, DEPARTMENT OF CORRECTION OTIS BANTUM CORRECTIONAL CENTER ("OBCC") ACTING WARDEN LISA BARNABY, and DEPARTMENT OF CORRECTION ROSE M. SINGER CENTER (RMSC) WARDEN COURTENEY ROTHWELL

Defendants.

--------------------------------------------------------------------------------X

**No. 1:26-cv-02685-OEM-MMH**

**<u>FIRST AMENDED COMPLAINT - CLASS ACTION COMPLAINT AND DEMAND FOR A JURY</u>**

Plaintiffs **BASIL WILLIAMS** and **PETER PERNA**, on behalf of themselves and all others similarly situated (collectively, the "Class"), by and through their attorneys, Kaishian & Mortazavi LLC and Wylie Stecklow PLLC, for their complaint allege as follows:

## **<u>INTRODUCTION</u>**

1. This case is about **DEFENDANT CITY OF NEW YORK** ("**DEFENDANT CITY**") intentionally and brazenly disregarding City, State, and Federal laws that require incarcerated pretrial detainees access to exercise, including out-of-cell recreation, as a basic human right.

2. For years, Rikers Island has failed to provide consistent, constitutionally-compliant out-of-cell exercise and recreation to its pretrial detainees.

3. Over the past several years, on Rikers Island, this crisis reached a breaking point, with incarcerated people in units throughout the jail receiving functionally no out-of-cell exercise or outdoor recreation for extended periods of time.

4.      Incarcerated pretrial detainees went weeks without feeling the sun touch their face.

5.      Several units within Rikers Island, including Plaintiffs' units, went weeks at a time without receiving any recreation or out-of-cell exercise. Others, at best, received recreation or out-of-cell exercise a handful of times throughout their detentions.

6.      At times, Plaintiffs would be caught in cycles of false hope and despair, where Captains and DOC members would time and time again promise that tomorrow would finally be the day they would receive recreation or out-of-cell time, only for tomorrow to come and go with no such recreation or out-of-cell time provided.

7.      The lack of recreation had severe consequences on Plaintiffs, harming their emotional and physical wellbeing, exacerbating existing health conditions, causing entirely new injuries, and removing opportunities for Plaintiffs to maintain their physical and mental health.

8.      Accordingly, Plaintiffs **BASIL WILLIAMS** and **PETER PERNA** bring this case on behalf of themselves and all others similarly situated to seek accountability for Defendants' unlawful practices violating, *inter alia*, their rights as incarcerated individuals under the Fourteenth Amendment and the New York State Correction Law.

## **JURISDICTION AND VENUE**

9.      This action arises under the Fourteenth Amendment to the United States Constitution, New York State Constitution, 42 U.S.C. § 1983, and New York State common law.

10.     This Court has subject matter jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs' claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the Constitution of the United States.

11. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

12. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because **DEFENDANT CITY** resides in this judicial district and Plaintiffs' claims arose in this judicial district.

**PARTIES**

13. **PLAINTIFF BASIL WILLIAMS ("PLAINTIFF WILLIAMS")** is a natural adult person. Plaintiff currently resides in **BRONX COUNTY** and is not incarcerated. **PLAINTIFF WILLIAMS** was subjected to the conditions of confinement described herein at the OBCC jail at Rikers Island from on or about February 7, 2025 to April 29, 2025, and from on or about June 26, 2025 through on or about September 10, 2025.

14. **PLAINTIFF PETER PERNA ("PLAINTIFF PERNA")** is a natural adult person. Plaintiff currently resides in **NEW YORK COUNTY** and is not incarcerated. **PLAINTIFF PERNA** was subjected to the conditions of confinement described herein on Rikers Island, including at OBCC, RESH, and EMTC at various periods between on or about March 28, 2025 until his release on or about October 22, 2025.

15. **DEFENDANT CITY OF NEW YORK ("DEFENDANT CITY")**, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. **DEFENDANT CITY** acts by and through its agencies, employees and agents, including, but not limited to, the New York City Department of Correction ("DOC") and its personnel. Under New York State law, **DEFENDANT CITY** is responsible for the acts and/or omissions of its employees and/or agents as described herein pursuant to the doctrine of *respondeat superior*.

16.     **DEFENDANT CITY** is responsible for promulgating and implementing policies and practices with respect to access to recreation and exercise for DOC detainees, and is responsible for the appointment, training, supervision, and conduct of all DOC personnel.

17.     **DEFENDANT DOC COMMISSIONER LYNELLE MAGINLEY-LIDDIE ("DEFENDANT MAGINLEY-LIDDIE")**, at all relevant times served as the Commissioner of **DEFENDANT CITY**'s DOC. As such, **DEFENDANT MAGINLEY-LIDDIE** was the chief executive of DOC and was responsible for approving, promulgating, designing, and implementing policies and procedures across **DEFENDANT CITY**'s jails and for ensuring DOC's adherence to laws, rules, and regulations governing the same. At all relevant times, **DEFENDANT MAGINLEY-LIDDIE** was a final policymaker for **DEFENDANT CITY** with respect to the policies and practices of DOC. Upon information and belief, **DEFENDANT MAGINLEY-LIDDIE** was personally involved in the decision to fail to provide regular access to recreation for those detained in OBCC. **DEFENDANT MAGINLEY-LIDDIE** is sued individually, as an employee and/or agent of **DEFENDANT CITY**, and in her official capacity as a policymaker for **DEFENDANT CITY**.

18.     **DEFENDANT SENIOR DEPUTY COMMISSIONER FRITZ FRAGE ("DEFENDANT FRAGE")**, at all relevant times served as a Senior Deputy Commissioner of **DEFENDANT CITY**'s DOC. As such, **DEFENDANT FRAGE** was responsible for approving, promulgating, designing, and implementing policies and procedures across **DEFENDANT CITY**'s jails and for ensuring DOC's adherence to laws, rules, and regulations governing the same. At all relevant times, **DEFENDANT FRAGE** was a policymaker for **DEFENDANT CITY** with respect to the policies and practices of DOC. Upon information and belief, **DEFENDANT FRAGE** was personally involved in the decision to fail to provide regular access to recreation for

those detained in OBCC. **DEFENDANT FRAGE** is sued individually, as an employee and/or agent of **DEFENDANT CITY**, and in his official capacity as a policymaker for **DEFENDANT CITY**.

19. **DEFENDANT OBCC ACTING WARDEN LISA BARNABY ("DEFENDANT ACTING WARDEN BARNABY")** was at all times relevant to this Complaint the Warden for OBCC. As Warden for OBCC, **DEFENDANT ACTING WARDEN BARNABY** was responsible for implementing and enforcing administrative and managerial policies and procedures, including DOC policies, Board of Correction (BOC) standards, and applicable laws and regulations. **DEFENDANT ACTING WARDEN BARNABY** received all grievances, incident reports, investigation reports, and all other reports, complaints, and filings generated in relation to incidents and/or policies at OBCC. **DEFENDANT ACTING WARDEN BARNABY** was responsible for acknowledging, reviewing, and responding to all such reports, including by disciplining officers, ordering training, addressing failures, and/or implementing changes to policies and procedures in place at the jail. At all relevant times, **DEFENDANT ACTING WARDEN BARNABY** was the Chief Administrative Officer for OBCC. At all relevant times, **DEFENDANT ACTING WARDEN BARNABY** was a final policymaker for **DEFENDANT CITY** with respect to the implementation of DOC policies and practices at OBCC. **DEFENDANT ACTING WARDEN BARNABY** is sued individually, as an employee and/or agent of **DEFENDANT CITY**, and in their official capacity as a policymaker for **DEFENDANT CITY**.

20. **DEFENDANT ROSE M. SINGER CENTER WARDEN COURTENEY ROTHWELL ("DEFENDANT WARDEN ROTHWELL")** was at all times relevant to this Complaint the Warden for RMSC and RESH. As Warden for RMSC, **DEFENDANT WARDEN ROTHWELL** was responsible for implementing and enforcing administrative and managerial

policies and procedures, including DOC policies, Board of Correction (BOC) standards, and applicable laws and regulations. **DEFENDANT WARDEN ROTHWELL** received all grievances, incident reports, investigation reports, and all other reports, complaints, and filings generated in relation to incidents and/or policies at RMSC. **WARDEN ROTHWELL** was responsible for acknowledging, reviewing, and responding to all such reports, including by disciplining officers, ordering training, addressing failures, and/or implementing changes to policies and procedures in place at the jail. At all relevant times, **WARDEN ROTHWELL** was the Chief Administrative Officer for RMSC. At all relevant times, **WARDEN ROTHWELL** was a final policymaker for **DEFENDANT CITY** with respect to the implementation of DOC policies and practices at RMSC. **DEFENDANT ACTING WARDEN ROTHWELL** is sued individually, as an employee and/or agent of **DEFENDANT CITY**, and in their official capacity as a policymaker for **DEFENDANT CITY**.

<u>**STATEMENT OF FACTS**</u>

21.     The events complained of herein occurred at least between July 1, 2023 to June 22, 2026, at several of **DEFENDANT CITY**'s Rikers Island jail complexes, including, without limitation, Otis Bantum Correctional Center ("OBCC"), located at 16-00 Hazen St., East Elmhurst, City and State of New York and Rose M. Singer Center ("RMSC"), located at 19-19 Hazen St., East Elmhurst, City and State of New York,

22.     OBCC is designated as a jail for adult men located on Rikers Island.

23.     At any given time, approximately 1,600 detained people are housed at OBCC.

24.     In an overwhelming number of units across Rikers Island throughout 2025 to the present, incarcerated people experienced unlawfully limited access to out-of-cell exercise facilities or

recreation, with many going for weeks on end without access to recreation or receiving access to recreation at most once or twice a month.

25. Denying incarcerated people access to meaningful exercise violates the Constitution because "exercise is widely understood to be a basic human need," and "deprivation of meaningful exercise poses a risk of serious health problems." *Edwards v. Quiros*, 986 F.3d 187, 194 (2d Cir. 2021).

26. DOCCS Minimum Standards PART 7028 requires "exercise periods which, at the discretion of the chief administrative officer, shall consist of: (1) at least 1 1/2 hours during each of five days per week; or (2) at least one hour seven days a week." which must be outdoors except for inclement weather.

27. Similarly, the NYC Board of Correction Minimum Standards, Title 40 § 1-06 Recreation requires that "Recreation periods shall be at least one hour."

28. Class members experienced the well-documented deleterious effects of effectively no access, or extremely limited access, to out-of-cell exercise facilities or recreation on their physical and emotional wellbeing.

29. The Board of Correction (BOC), the oversight body responsible for overseeing DOC's compliance with the Minimum Standards, has documented an egregious lack of recreation and its resultant impact on the health conditions of detainees.

30. The BOC's review of grievances within Rikers Island noted that detainees report serious impacts on their mental and physical health from lack of exercise, including one detainee reporting a progression from pre-diabetes to diabetes.

31. Rikers Island is a pretrial detention center intended to house pretrial, rather than sentenced, individuals.

32. Plaintiffs, like 85% of all individuals in DOC custody, at the time of their detention were presumed innocent and were awaiting trial.

33. **DEFENDANT CITY**, by its DOC agents and/or employees, under the supervision of **DEFENDANT MAGINLEY-LIDDIE, DEFENDANT FRAGE** and **DEFENDANT OBCC WARDEN**, initiated and oversaw this almost complete bar on any out-of-cell exercise or recreation for **PLAINTIFFS**, including, *inter alia*, within OBCC and RMSC at Rikers Island.

34. Class members complained and filed grievances identifying these illegal practices and conditions throughout this time period in which **DEFENDANT OBCC WARDEN** received and reviewed.

35. **DEFENDANT CITY**, by its DOC agents and/or employees, under the supervision of **DEFENDANT MAGINLEY-LIDDIE**, **DEFENDANT FRAGE**, and **DEFENDANT OBCC WARDEN** were on notice of the egregiously limited access to recreation for incarcerated people within OBCC.

36. Despite this knowledge, Defendants failed to address these problems.

37. There are no indoor exercise facilities within the jails Plaintiffs were incarcerated in, including OBCC and RMSC.

38. For those in dormitory-based facilities on Rikers Island, including in OBCC and RMSC, there is not access to indoor exercise facilities or spaces or opportunity to exercise.

39. For those in cell-based facilities on Rikers Island, including within OBCC and RMSC, not only is there no access to indoor exercise facilities or opportunities to exercise, but also the cells themselves are not large enough or fit to accommodate exercise.

40. For Plaintiffs, and putative class members within Rikers Island, without access to outdoor recreation, there is no meaningful opportunity to exercise at all.

41.     Without access to meaningful opportunity to exercise, Plaintiffs and putative class members experienced serious physical and emotional harms.

**NAMED PLAINTIFFS**

*Plaintiff Basil Williams*

42.     **PLAINTIFF BASIL WILLIAMS ("PLAINTIFF WILLIAMS")** was incarcerated pretrial in **DEFENDANT CITY's** custody beginning on January 26, 2025, and until his release on or about October 9, 2025.

43.     **DEFENDANT CITY**, by its DOC agents and/or employees, subjected Plaintiff an almost complete bar on access to recreation, out-of-cell exercise, or any access to exercise during his placements in OBCC beginning on or about February 8, 2025 until on or about April 6, 2025 in OBCC 3W, from on or about April 6, 2025 to April 9, 2025 in 5 South, and from on or about June 26, 2025 to September 10, 2025 in OBCC 5 South.

44.     While in OBCC 3 West, a cell-based unit, **PLAINTIFF WILLIAMS** only received recreation or out-of-cell exercise about one time in total.

45.     **PLAINTIFF WILLIAMS** and others would ask why they were not receiving recreation, and they were told to speak to a Captain.

46.     Each time a DOC member Captain arrived to discuss with **PLAINTIFF WILLIAMS** and other incarcerated individuals, the Captain would indicate they were aware recreation and out-of-cell exercise was not being provided, and would provide excuses, including frequently citing staff shortages as the reason.

47.     While in OBCC 5 South, a cell-based unit, **PLAINTIFF WILLIAMS** only received recreation about two times in total.

48. While in OBCC 5 South, **PLAINTIFF WILLIAMS** and putative class members were further regularly subjected to lockdowns where they would not be permitted to leave their cell at all for days on end, including lockdowns that exceeded two days in length.

49. During these lockdowns, not only could **PLAINTIFF WILLIAMS** and putative class members not access out-of-cell exercise facilities or recreation, but also they would be deprived of the ability to leave for showers, basic hygiene, or other reasons.

50. In over a four-month period between his time in OBCC 3 West and OBCC 5 South, **PLAINTIFF WILLIAMS** received recreation on or about three times, for about an average of less than once a month.

51. During his time on Rikers Island, including within OBCC in 2025, on several occasions **PLAINTIFF WILLIAMS** experienced over three weeks passing with no access to recreation or out-of-cell exercise at all.

52. **PLAINTIFF WILLIAMS** was distraught about this illegal bar on his access to recreation.

53. From incarceration, **PLAINTIFF WILLIAMS** called 311 and filed grievances on these issues.

54. These grievances were reviewed by DOC staff and the **DEFENDANT OBCC WARDEN**.

55. The extended periods of no access to recreation or out-of-cell exercise imposed by **DEFENDANT CITY** and the related conditions of confinement caused serious injuries to **PLAINTIFF WILLIAMS**.

56. On days that **PLAINTIFF WILLIAMS** did not have access to recreation, he had no meaningful access to exercise at all.

57. The conditions imposed by **DEFENDANT CITY** caused Plaintiff to suffer from exacerbated depression and anxiety.

58. The conditions imposed by **DEFENDANT CITY** caused Plaintiff physical pain and suffering, including the deleterious effects of receiving limited sunlight, the deleterious effects of being denied recreation, and further physical injuries and suffering.

59. **PLAINTIFF WILLIAMS** continues to suffer from further emotional and psychological trauma caused by Defendants in imposing the described conditions.

60. The full extent of **PLAINTIFF WILLIAMS's** injuries are not yet known.

*Plaintiff Peter Perna*

61. **PLAINTIFF PETER PERNA ("PLAINTIFF PERNA")** was incarcerated pretrial in **DEFENDANT CITY**'s custody on Rikers Island beginning on March 27, 2025, and until his release on or about October 22, 2025.

62. During the entire time that **PLAINTIFF PERNA** was incarcerated in Rikers Island, he did not receive regular recreation.

63. The lack of recreation was especially egregious while **PLAINTIFF PERNA** was incarcerated in specific units at Rikers Island, including, *inter alia*, OBCC 2SW and RMSC's RESH.

64. **DEFENDANT CITY**, by its DOC agents and/or employees, subjected Plaintiff an almost complete bar on access to recreation, out-of-cell exercise, or any access to exercise during his placements in OBCC 2SW and RMSC's RESH.

65. From April 3, 2025 until April 12, 2025, and from May 7, 2025 until May 16, 2025, **PLAINTIFF PERNA** was incarcerated in OBCC 7 Lower. During this placement, he received recreation a handful of times.

66. From May 16, 2025 until July 14, 2025, **PLAINTIFF PERNA** was incarcerated within RMSC RESH, a cell unit.

67. In cell units within RMSC's RESH, **PLAINTIFF PERNA** did not have access to any out-of-cell exercise other than the rare occasions he was taken to recreation.

68. The common areas were not suitable or available for exercise.

69. **PLAINTIFF PERNA**'s cell also did not allow for in-cell exercise.

70. The cell was too small, and it was impossible to meaningfully exercise without bumping into either the toilet or the bed.

71. Accordingly, on days that **PLAINTIFF PERNA** did not receive recreation within RMSC's RESH, he did not receive exercise.

This lack of recreation became so bad that **PLAINTIFF PERNA** began tracking the daily lack of access to recreation via regular grievances mid-June.

72. **PLAINTIFF PERNA** filed grievances indicating that within RMSC's RESH he did not have access to recreation on June 11, 13, 15, 17, 19, 20, 21, 22, 23, 25, 26, 27, 28, 29, 30, and July 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20, 2025.

73. In other words, from June 19 to July 20, for a period of over a month when he was tracking, **PLAINTIFF PERNA** only received recreation, at maximum, on or about 3 times in a one month period while in RESH—June 24, July 2, and July 3, 2025.

74. Throughout **PLAINTIFF PERNA**'s placement in RMSC's RESH, DOC members repeatedly knowingly and intentionally falsified the logbook, indicating "Rec Requested: No" even though **PLAINTIFF PERNA** repeatedly requested recreation.

75. DOC Member Staff appear to have a pattern and practice consistently falsifying such logbooks to falsely indicate no one has requested recreation on days that DOC members deny recreation to a unit.

76. The goal of these falsifications is to hide from oversight agencies and others the true extent of denial of recreation that incarcerated people within Rikers are experiencing.

77. The log books for June 22 and June 23 both falsely indicated "Recreation Requested: No."

78. On June 24, 2025, in a response to one of **PLAINTIFF PERNA**'s grievances about lack of recreation within RESH on June 22 and 23rd, Captain Ni-Ne Valverde (#1373) sent the following memorandum to **DEFENDANT RMSC WARDEN ROTHWELL:**

> My investigation revealed on June 22nd and June 23, 2025, recreation was not afforded to building 14 due to lack of staff. I there fore (sic) find the complaint lodged **founded**.

79. Although the investigation into this grievance would require looking at the logbooks, there was no note of how the logbook was falsified to obfuscate the lack of provided recreation to the unit.

80. Accordingly, no staff were disciplined for falsifying the logbook.

81. On June 25, 2025, in a response to one of **PLAINTIFF PERNA**'s grievances about lack of recreation within RESH on June 22 and 23rd, **DEFENDANT RMSC WARDEN ROTHWELL** sent the following memo to Dr. Michele Stafford, Executive Director, Office of Constituent and Grievance Services that stated in relevant part:

> Captain Valverde #1373 conducted an investigation regarding the above complaint. PIC Perna is currently housed in RESH building 14 level 2 housing. Captain Valverde attempted to interview PIC Perna in the confines of building 14, PIC Perna refused to provide a written or verbal Inmate Voluntary Statement. This investigation revealed on June 22 and June 23, 2025, **recreation was not afforded to building 14 due to lack of staff**.
>
> **Captain Valverde finds this complaint unfounded.**
>
> As a result, this complaint is addressed, and no additional action is necessary from the Rose M. Singer Center/RESH.

82. Despite Captain Valverde finding the original complaint founded, **DEFENDANT RMSC WARDEN ROTHWELL** falsely characterized the complaint finding as "unfounded."

83. This was not just a typo—if the complaint was founded, action would be required.

84. Here, because the complaint was "unfounded", no additional action was found necessary.

85. Upon information and belief **DEFENDANT RMSC WARDEN ROTHWELL** deliberately falsified the results of the grievance investigation into **PLAINTIFF PERNA**'s denial of recreation to obfuscate the wholesale denial of recreation from oversight bodies such as the Board of Corrections.

86. On August 13, 2025, in a response to another one of **PLAINTIFF PERNA**'s grievances about lack of recreation within RESH, **DEFENDANT RMSC WARDEN ROTHWELL** sent the following memo to Dr. Michele Stafford, Executive Director, Office of Constituent and Grievance Services that stated in relevant part:

> Captain Maxwell #1783 conducted an investigation regarding the above complaint. At the time this investigation was conducted PIC Perna was housed in RESH building 14 Level 2 housing. Said PIC was interviewing regarding the above complaint and provided a written statement stating, "there was no rec offered on the following dates in year 2025 may 30, June 11, 13, 15, 17, 19, 20, 21, 23, 25, 26, 27, 28, 29, 30 July 1, 4, 5, 6, 7". PIC Perna was housed in RESH from May 16, 2025 were (sic) he disclosed to Captain Maxwell a detailed listing of all days he was unable to go to recreation. A review of the mandated service logbooks during that time revealed recreation was cancelled for all of the dates listed for "service closed/not scheduled" due to staff shortage.
>
> In conclusion, this 311 complaint is substantiated. From Captain Maxwell's investigation, PIC Perna was not afforded recreation on the dates of his complaint and is documenting each occurrence. These findings will be reported to the Tour Commander.
>
> As a result, this complaint is addressed, and no additional action is necessary from the Rose M. Singer Center/RESH.

87. Although **DEFENDANT RMSC WARDEN ROTHWELL** reported this complaint as substantiated, she noted that the only action required of RMSC was reporting this finding to the Tour Commander.

88. **DEFENDANT RMSC WARDEN ROTHWELL** did not make any substantive changes to address this ongoing wholesale lack of recreation.

89. On September 10, 2025, Captain Shakeena Mcintosh (#1673) sent an investigative memorandum to **DEFENDANT RMSC WARDEN ROTHWELL** about **PLAINTIFF PERNA**'s grievance, which grieved in relevant part that on June 27 and 28 they were not allowed access to recreation.

90. The report stated in relevant part, "On June 27, 2025, building 14 wasn't afforded recreation due to being placed on lockdown status after a slashing occurred COD #1837-25. June 28, 2025 SRT was on post and the facility was in TSO status" and "Based on my investigation, I find the complaint **unsubstantiated**."

91. Captain Mcintosh's report is illustrative of an ongoing pattern and practice at Rikers, where the internal grievance system notes reports of denial of services are "unsubstantiated" when the report themselves finds the services were in fact not provided.

92. Following this report, **DEFENDANT RMSC WARDEN ROTHWELL** sent the following memo to Dr. Michele Stafford, Executive Director, Office of Constituent and Grievance Services that stated in relevant part that the complaint was unsubstantiated—even though recreation was not provided—and noted that "no additional action is necessary from the Rose M. Singer Center/RESH."

93. This egregious lack of recreation continued when **PLAINTIFF PERNA** was placed in OCCC 2SW, a cell unit.

94. In cell units like OBCC 2SW, **PLAINTIFF PERNA** did not have access to any out-of-cell exercise other than the rare occasions when he was taken to recreation.

95. The common areas were not suitable or available for exercise.

96. **PLAINTIFF PERNA**'s cell also did not allow for in-cell exercise.

97. The cell was too small, and it was impossible to meaningfully exercise without bumping into either the toilet or the bed.

98. Accordingly, on days that **PLAINTIFF PERNA** did not receive recreation he did not receive exercise.

99. From July 20, 2025 until September 24, 2025, in OBCC 2SW, **PLAINTIFF PERNA** hardly received any recreation or out-of-cell exercise at all.

100. Within OBCC 2SW, **PLAINTIFF PERNA** filed grievances indicating he did not receive recreation on July 20, 21, 22, 23, 24, 26, 27**,** 28, 29, 30, 31,  August 2, 3, 4, 5, 6, 7, 8, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, and September 1, 2, 3, 4, 5, 6, 8,  9, 10, 11, 12, 13, 14, 15, 16, 17, 20, and 21.

101. From August 9 through 12, 2025, OBCC was in a facility-wide lockdown without recreation.

102. In other words, from July 20, 2025 through September 17, 2025, **PLAINTIFF PERNA** only received recreation, at maximum, on or about four times—July 25, August 1, August 22, and September 7.

103. In August and September 2025, **PLAINTIFF PERNA** went 21 consecutive days without recreation, had 1 day of recreation, went *another* 16 days without recreation, had one day of recreation, and then went yet another 10 days without recreation.

104.     DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 7 due to "insufficient staff" for 1 Lower, 2 Lower, 3 Lower, 4 Lower, 5 Lower, 6 Lower, 7 Lower, 8 Lower, 1 Upper, 2 Upper, 3 Upper, 4 Upper, 5 Upper, 6 Upper, 7 Upper, 8 Upper, 1 South, 2 South, 2 Southwest, 3 South, 3 Southwest, 4 South, 4 Southwest, 5 South, 5 Southwest, 1 North, 1 West, 3 North, 3 West, 5 North, 5 West, and 1 Southwest.

105.     DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 8 due to "insufficient staff" for  1 Lower, 2 Lower, 3 Lower, 4 Lower, 5 Lower, 6 Lower, 7 Lower, 8 Lower, 1 Upper, 2 Upper, 3 Upper, 4 Upper, 5 Upper, 6 Upper, 7 Upper, 8 Upper, 1 South, 2 South, 2 Southwest, 3 South, 3 Southwest, 4 South, 4 Southwest, 5 South, 5 Southwest, 1 North, 1 West, 3 North, 3 West, 5 North, 5 West, 1 Southwest.

106.     DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 9 due to "insufficient staff" for 1 Lower, 2 Lower, 3 Lower, 4 Lower, 5 Lower, 6 Lower, 7 Lower, 8 Lower, 1 Upper, 2 Upper, 3 Upper, 4 Upper, 5 Upper, 6 Upper, 7 Upper, 8 Upper, 1 South, 2 South, 2 Southwest, 3 South, 3 Southwest, 4 South, 4 Southwest, 5 South, 5 Southwest, 1 North, 1 West, 3 North, 3 West, 5 North, 5 West, and 1 Southwest.

107.     DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 10  due to "TSO" for 1 Lower, 2 Lower, 3 Lower, 4 Lower, 5 Lower, 6 Lower, 7 Lower, 8 Lower, 1 Upper, 2 Upper, 3 Upper, 4 Upper, 5 Upper, 6 Upper, 7 Upper, 8 Upper, 1 South, 2 South, 2 Southwest, 3 South, 3 Southwest, 4 South, 4 Southwest, 5 South, 5 Southwest, 1 North, 1 West, 3 North, 3 West, 5 North, 5 West, and 1 Southwest.

108.     DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 11 due to "TSO" for 1 Lower, 2 Lower, 3 Lower, 4 Lower, 5 Lower, 6 Lower, 7 Lower, 8 Lower, 1 Upper, 2 Upper, 3 Upper, 4 Upper, 5 Upper, 6 Upper, 7 Upper, 8 Upper, 1 South, 2

South, 2 Southwest, 3 South, 3 Southwest, 4 South, 4 Southwest, 5 South, 5 Southwest, 1 North, 1 West, 3 North, 3 West, 5 North, 5 West, and 1 Southwest.

109. DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 13 due to "shift reduced/insufficient staff" for 1 North, 1 West, 3 North, 3 West, 5 North, 5 West, and 1 Southwest.

110. On August 15, 2025, Captain Tashana Mack (#1818) submitted an Interdepartmental Memorandum to **DEFENDANT BARNABY** in response to one of **PLAINTIFF PERNA**'s 311 complaints.

111. The Memorandum stated:

> I, Captain Mack #1818 conducted am (sic) investigation into Task ID #275154. I interviewed individual Pernal who provided a written statement (see attached). My investigation revealed that recreation has been afforded several times during the current month. Although recreation has not been afforded daily due to staff shortage, Tactical Search Operations (TSO), and facility lockdowns. (sic) recreation is afforded when sufficient staff is available

112. On August 15, 2025, **DEFENDANT BARNABY**, sent a memo to Dr. Michelle Banks, Executive Director, Office of Constituent and Grievance, with the subject "OBCC 'General Facility Response' Task ID:276493."

113. The memo stated as follows:

> The Otis Bantum Correction Center faced challenges with affording Individuals Recreation Services due to insufficient staff, and Tactical Search Operations. Recreation staff are being utilized to fill housing area posts, where MOS are going into triples. However, once relieved recreation is being afforded unfortunately due to the time restrain all housing unit are not able to be afforded.
>
> This memorandum serves as a response to the complaint #276493 submitted by Perna Peter B&C #3492501356, concerning the alleged failure to provide mandated one-hour daily Recreation period as outlined in application correctional standards and regulations.
>
> The Department acknowledges its obligation to ensure all incarcerated individuals are afforded access to required services, including daily Recreation. We recognize

the essential role that physical activity plays in the health, well-being, and rehabilitation of individuals in custody, and the facility remains committed to upholding these standards to the greatest extent possible.

That said, there are operational and security-related circumstances that have at times, impacted our ability to consistently provide daily Recreation services. These factors include:
- **Institutional staffing limitations,** which have directly affected the availability of supervision necessary to facilitate safe Recreation periods.
- **Facility-wide search operation**s, which are periodically conducted in the interest of institutional safety and security.
- **Incident-driven lockdowns**, implements in response to emergent threats or disruptions within specific housing units.

These measures, while temporary and situational, are employed in accordance with departmental policy and are intended to preserve the safety of both the incarcerated population and staff. When such disruptions occur, the facility endeavors to resume normal operations, including the provision of Recreation, as promptly and safely as circumstances permit.

Please be advised that the facility continues to monitor and assess its compliance with mandated services and remains committed to maintaining operational practices that reflect both the rights and safety of those in custody.

114. DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 20 due to "insufficient staff" for 1 Lower, 2 Lower, 3 Lower, 4 Lower, 5 Lower, 6 Lower, 7 Lower, 8 Lower, 1 Upper, 2 Upper, 3 Upper, 4 Upper, 5 Upper, 6 Upper, 7 Upper, 8 Upper, 1 South, 2 South, 2 Southwest, 4 South, 4 Southwest, 5 South, 5 Southwest.

115. DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 21 due to "insufficient staff" for 1 Lower, 2 Lower, 3 Lower, 4 Lower, 5 Lower, 6 Lower, 7 Lower, 8 Lower, 1 Upper, 2 Upper, 3 Upper, 4 Upper, 5 Upper, 6 Upper, 7 Upper, 8 Upper, 1 South, 2 South, 2 Southwest, 3 South, 3 Southwest, 4 South, 4 Southwest, 5 South, 5 Southwest.

116. DOC's Daily Facility Recreation Report for OBCC indicated that recreation was cancelled on August 22 due to "insufficient staff/shift reduced" for 1 North, 1 West, 3 North, 3 West, 5 North, 5 West, and 1 Southwest.

117. On August 22, 2025, **DEFENDANT BARNABY**, sent a memo identical to her August 15, 2025 memo about lack of recreation to Dr. Michelle Banks, Executive Director, Office of Constituent and Grievance.

118. Throughout the duration of his time at Rikers, including within OBCC, **PLAINTIFF PERNA** would regularly file grievances about the lack of recreation to no avail.

119. These grievances were reviewed by DOC staff and the **DEFENDANT BARNABY**.

120. **PLAINTIFF PERNA** would also regularly raise the issue of not receiving recreation with various DOC Officers.

121. Some DOC Officers were sympathetic, and told **PLAINTIFF PERNA** that they knew the lack of access to recreation violated the minimum standards, but there was nothing they could do about it. These DOC Officers urged **PLAINTIFF PERNA** and others to "contact a lawyer" because they insisted there was nothing they could do to provide regular and constitutionally adequate access to recreation.

122. These officers were few and far between.

123. From July to September 2025, these DOC Captains and DOC Officers in 2SW would lie to **PLAINTIFF PERNA**, provide excuses, and actively discourage him from raising concerns about the lack of recreation those in OBCC were receiving.

124. CO Rosa would tell **PLAINTIFF PERNA** that the lack of recreation was because they were short staffed. She also told **PLAINTIFF PERNA** to stop asking about access to recreation, because, in sum and substance, "it's not going to get you anywhere."

125. CO Boronme (#15002) would tell **PLAINTIFF PERNA** that they were not allowed daily recreation, and that **PLAINTIFF PERNA** should stop asking questions about recreation in the first place.

126. Captain Washington would lie to **PLAINTIFF PERNA** and tell him, in sum and substance, referring to the unit, "you're actually not allowed to get rec." Other times, Captain Washington would just ignore **PLAINTIFF PERNA** and pretend to not hear him.

127. Captain Millington would dismiss **PLAINTIFF PERNA**'s concerns about not receiving recreation and would tell him, in sum and substance, "you're doing too much."

128. When **PLAINTIFF PERNA** would raise his concerns about not receiving recreation to Captain Farke (#1739), he would tell **PLAINTIFF PERNA** to go back to his bed and leave him alone, and that he was too busy to hear **PLAINTIFF PERNA**'s complaints.

129. When **PLAINTIFF PERNA** would raise his concerns about not receiving recreation to Deputy Manning, she would say things like, in sum and substance, "not today, today's a Friday," and shoo him away.

130. When **PLAINTIFF PERNA** would ask Captain Knight about not receiving recreation, she would provide excuses like, "Oh it rained today," even on days where it did not rain.

131. When **PLAINTIFF PERNA** would continue to ask about access to recreation, Captain Knight would state, "Do you know how much work you're giving these COs?" and would still refuse to provide recreation.

132. **PLAINTIFF PERNA** observed a culture where COs could fail to provide or staff recreation without discipline.

133. **PLAINTIFF PERNA** also observed a persistent faulty understanding by DOC members that some units were not entitled to or "allowed" to receive regular recreation.

134. The rest of his time incarcerated at Rikers Island, which was in various units in OBCC, recreation became slightly more frequent, but still fell far below the minimum standards, with recreation access topping out at about two days per week.

135. From September 27, 2025 until September 29, 2025, **PLAINTIFF PERNA** was in OBCC 5W.

136. From September 30, 2025 to October 3, 2025, **PLAINTIFF PERNA** was in OBCC 3W.

137. From October 4, 2025 to October 22, 2025, **PLAINTIFF PERNA** was in OBCC 2SW.

138. The extended periods of no access to recreation or out-of-cell exercise imposed by **DEFENDANT CITY** and the related conditions of confinement caused serious injuries to **PLAINTIFF PERNA**.

139. On days that **PLAINTIFF PERNA** did not have access to recreation, he had no meaningful access to exercise at all.

140. The conditions imposed by **DEFENDANT CITY** caused Plaintiff physical pain and suffering, including the deleterious effects of receiving limited sunlight, the deleterious effects of being denied recreation, and further physical injuries and suffering.

141. **PLAINTIFF PERNA** also received facial nerve damage from an assault within Rikers.

142. Stress exacerbates the facial nerve damage. The lack of recreation exacerbated the amount of facial nerve pain that **PLAINTIFF PERNA** was in.

143. The lack of exercise also caused **PLAINTIFF PERNA** to suffer more back and body pain.

144. The lack of any regular or meaningful access to exercise or recreation had severe physical and mental health impacts on **PLAINTIFF PERNA.**

145. All of his life, **PLAINTIFF PERNA** relied on exercise as a core component of his mental wellness, and one of his core coping strategies.

146. Access to recreation also provided a safer and less hostile environment in the unit.

147. Without access to regular exercise, **PLAINTIFF PERNA**'s depression, anxiety, and PTSD all significantly worsened.

148. **PLAINTIFF PERNA** continues to suffer from further emotional and psychological trauma caused by Defendants in imposing the described conditions.

149. The full extent of **PLAINTIFF PERNA**'s injuries are not yet known.

## CLASS ALLEGATIONS

150. With respect to their claims for damages, Plaintiffs bring this action on their own behalf and, pursuant to Federal Rule of Civil Procedure 23, on behalf of:

> All detainees who, at any time on or after July 1, 2023, for any period of two months or longer, received access to out-of-cell exercise facilities or recreation three times a month or fewer on Rikers Island, when any of that period of time was within OBCC jail facility on Rikers Island.

151. Plaintiffs further bring this action on their own behalf and, pursuant to Federal Rule of Civil Procedure 23, on behalf of:

> All detainees who, at any time on or after July 1, 2023, went more than 21 days without receiving any access to recreation or out-of-cell exercise facilities on Rikers Island, when any of that period of time was within OBCC jail facility on Rikers Island.

152. **PLAINTIFF WILLIAMS** further brings this action on his own behalf and, pursuant to Federal Rule of Civil Procedure 23, on behalf of:

> All detainees who, at any time on or after July 1, 2023, for any period of two months or longer, received access to out-of-cell exercise facilities or recreation an average of three times a month or fewer when placed in a cell-based unit on Rikers Island, when any of that period of time was within OBCC jail facility on Rikers Island.

153. In OBCC alone, at least 500 people on any given day were subjected to these conditions, with transfers, releases, and new assignments regularly increasing the number of people subjected to these practices.

154. In addition to the impracticability of filing individual suits for a class this large, members of the putative class are economically disadvantaged, making individual lawsuits impracticable.

155. Judicial economy weighs in favor of avoiding multiple actions challenging the same policy and practice, particularly where individual suits could lead to potentially inconsistent results.

156. The class members are identifiable using records maintained by **DEFENDANT CITY** in the ordinary course of business.

157. Common questions of law and fact exist for all class members herein and predominate over any questions solely affecting individual members thereof.

158. Among the questions of law and fact common to members of the class are:

   a. Whether Defendants' policy and practice of almost entirely limiting access to recreation and out-of-cell exercise for incarcerated individuals at OBCC within Rikers Island violates the Fourteenth Amendment.

   b. Whether Defendants' policy and practice of almost entirely limiting access to recreation and out-of-cell exercise for incarcerated individuals at OBCC within Rikers Island violates the New York State Constitution.

   c. Whether the Defendants' policy and practice of denying daily out-of-cell exercise or recreation in Defendant City's jails violated the New York State HALT Solitary Act;

   d. Whether Defendants were deliberately indifferent to a substantial risk of harm to the incarcerated people who were denied access to regular out-of-cell exercise or recreation in Defendant City's jails;

   e. Whether the Defendants breached its special duty to Plaintiffs via this conduct such that the damages Plaintiffs experienced arose from Defendants' negligence under New York State law.

159. **DEFENDANT CITY** is expected to raise common defenses to the claims of all class members herein, including denying that its policy and practice violated the Fourteenth Amendment of the United States Constitution, the New York Constitution, and the New York State HALT Solitary Act.

160.     Plaintiffs' claims are typical of those of all putative class members herein, as Plaintiffs' claims arise from the same municipal policy and practice, and Plaintiffs' claims are based on the same legal theories as those of all putative class members herein.

161.     The cause of Plaintiffs' injuries is the same as the cause of injuries suffered by all putative class members herein, namely **DEFENDANT CITY's** policy and practice.

162.     Maintaining this action as a class action is superior to other available methods because individual damages claims are not likely to be feasible.

163.     Plaintiffs are capable of fairly and adequately protecting the interests of all putative class members herein because Plaintiffs do not have any antagonistic interests thereto.

164.     Counsel for Plaintiffs are experienced in civil rights litigation, prisoners' rights litigation, complex litigation, and class actions.

### <u>FIRST CLAIM FOR RELIEF</u>
**Deficient Conditions of Confinement**

***Against All Defendants Pursuant to the Fourteenth Amendment of the United States Constitution, and Against DEFENDANT CITY Pursuant to 42 U.S.C. § 1983 and* Monell v. Department of Social Services *(436 U.S. 658 [1978])***

165.     At the time of the incidents giving rise to this complaint, Plaintiffs were detained pretrial in the **DEFENDANT CITY**'s custody and control.

166.     As a person incarcerated by **DEFENDANT CITY**, Plaintiffs were subject to the conditions created, imposed, maintained, fostered, and/or permitted by Defendants.

167.     These conditions included almost complete bars on access to recreation, out-of-cell exercise, or access to meaningful exercise at all for those in many units in Rikers Island from July 1, 2023 onward, and for Plaintiffs at various points throughout 2025.

168.     This included exceedingly long periods of time with no access to recreation at all, and for

some units, access to exercise or recreation only a few times per month for months on end.

169. These conditions, either alone or in combination, posed a risk of serious damage to Plaintiffs' health, including risks to Plaintiffs' physical and/or mental soundness.

170. Defendants acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to Plaintiffs even though the Defendants knew, or should have known, that the conditions to which they subjected Plaintiffs posed an excessive risk to Plaintiffs' health or safety.

171. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs' bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

172. The unlawful conduct of the individual Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

173. **DEFENDANT CITY** and its Defendant Policymakers have long been on notice that the conditions in its jails, including lack of access to exercise or recreation, amount to constitutional violations of the rights of detained people, and that these conditions pose real threats to the lives of individuals such as Plaintiffs and those similarly situated.

174. It is an open secret amongst all levels of DOC and **DEFENDANT CITY** leadership that the egregiously deficient access to recreation or out-of-cell exercise within Rikers, and OBCC, falls well below any constitutional floor.

175. Every five days of Mayor Eric Adams term as chief policymaker of **DEFENDANT CITY**, including throughout all of 2025, Mayor Adams re-signed an Executive Order suspending DOC minimum standards and Local Law 42's ban on solitary confinement, citing that, "Department of

Correction's (DOC's) staffing levels…create a serious risk to DOC's ability to carry out. . . access to basic services, including. . . recreation."

176. Accordingly, **DEFENDANT CITY** and **DEFENDANT MAGINLEY-LIDDIE** as a matter of per se policy and/or actual policy accepted that DOC was on a regular basis throughout 2025 through the present failing to adequately carry out access to recreation as a basic service.

177. The illegal de facto bar on regular—or at times any—access to out-of-cell exercise or recreation fits into a much larger pattern of the Department of Correction showing total disregard for the law.

178. In July 2014, the New York City Board of Correction issued a report about lack of recreation within OBCC titled *Barriers to Recreation at Rikers Island's Central Punitive Segregation Unit*. https://www.nyc.gov/html/boc/downloads/pdf/reports/CPSU_Rec_Report.pdf

179. Although putative class members are not limited to those in punitive segregation, the survey conducted by BOC determined that "A striking 87.8% of the survey respondents indicated that they did not participate in recreation on any of the four days that were the focus of the survey," and "fewer than 1 in 10 prisoners in [CPSU within OBCC] participate in recreation on an average day, and a majority of [CPSU within OBCC] inmates go for days at a time without access to the outdoors." *Id.* at 10.

180. The report further noted that there was a pattern and practice of ordering recreation officers off-post to attend to other tasks, halting access to recreation on those days. *Id.* at 15.

181. The report further confirmed that there were "no indoor recreation facilities" available to incarcerated people. *Id.* at 19.

182. The report, in its conclusions presented to policymakers from the oversight body, "But to meet the Minimum Standards requiring that all prisoners have genuine access to an hour of outdoor

recreation every day and indoors during inclement weather DOC will have to expand staff and facilities or reduce the number of prisoners in punitive segregation. In considering both the course of reform and the need for reform, DOC should keep in mind that this hour of recreation is not a mere pleasure for prisoners – in fact, the term "recreation" is somewhat misleading. For individuals who are otherwise confined alone in small, spare cells, this hour of fresh air and sunlight and exposure to other people is essential for their mental and physical health and essential to promoting safety within the facility." *Id.* at 20.

183. In 2024, a Board of Correction report revealed that detainees at the Eric M. Taylor Center (EMTC) on Rikers Island had lacked access to outdoor recreation for over a year.[1]

184. In the February 28, 2024 Board of Correction meeting, BOC Executive Director Jasmine Georges-Yilla stated, "so the Board has asked the Department to share its plan for addressing complaints regarding lack of access to indoor and outdoor recreation and limited recreation time."

185. From December 1, 2023 to January 22, 2024, the Board of Correction found a total of 82 grievances submitted to the DOC regarding a lack of recreation, and noted that some of these grievances reported, "experiencing extended periods without any access to recreation at all."[2] Grievances also noted "denial of recreation for weeks."

186. In this meeting, Board of Correction meeting, Acting General Counsel Nancy Savasta stated, "We have challenges to the provision of rec and we acknowledge that here today."[3]

---

[1] Jacob Kaye, *Some Rikers detainees haven't gotten outdoor rec in over a year, oversight board finds* https://queenseagle.com/all/2024/2/29/some-rikers-detainees-havent-gotten-outdoor-rec-in-over-a-year-oversight-board-finds

[2] https://www.nyc.gov/assets/boc/downloads/pdf/Meetings/2024/february/February-2024-Board-Meeting-Minutes-Final.pdf

[3] https://www.nyc.gov/site/boc/meetings/20240228.page

187. In this same February 28, 2024, Board of Correction meeting, per the meeting minutes, the BOC reported that, "BOC staff observed conditions and concerns—expressed by both people in custody and Department staff—regarding recreation across facilities on Rikers. A consistent concern from Department staff is that they need more staff to efficiently operate recreation. They are constantly shift-reduced. They get tasked with other assignments, like court production, resulting in delays in recreation affordability."

188. **DEFENDANT MAGINLEY-LIDDIE** was present at this BOC meeting and gave her remarks immediately following these comments from BOC Executive Director Jasmine Georges-Yilla.

189. In her remarks, she did not directly address access to recreation or the concerns raised by the Board.

190. These practices of an unlawful, and unmitigated failure to provide access to out-of-cell exercise or recreation, or appropriate staffing to facilitate out-of-cell exercise or recreation have come from the top policymakers of **DEFENDANT CITY**, including **DEFENDANT MAGINLEY-LIDDIE**.

191. For years, **DEFENDANT MAGINLEY-LIDDIE** has been on notice that incarcerated people at Rikers have gone weeks without access recreation or any meaningful exercise, and that some went months on end without receiving more than a few days access to meaningful exercise.

192. In a September 9, 2025 Board of Corrections meeting, Executive Director Georges-Yilla read aloud data about access to recreation within OBCC in August 2025. https://www.nyc.gov/site/boc/meetings/20250909.page

193. **DEFENDANT FRAGE** presented at the meeting as a representative of the Department of Corrections and Department of Correction's policy.

194.    In his appearance, **DEFENDANT FRAGE** countered the Board of Corrections' assertion that there was a five-day facility-wide lockdown in OBCC. He testified that the Department authorized a facility-wide lockdown beginning on August 10, 2025 that was lifted on August 12, 2025, but "some housing areas maintained secured [locked-down] beyond that date."

195.    BOC Chair Sampson noted that there was confirmation from DOC staff that there was a five-day facility-wide lock-in in August 2025.

196.    A BOC member read aloud the data they had received about recreation in OBCC in August 2025. It noted that according to DOC-provided data, recreation was provided in 1 South 2 days that month, in 2 Southwest for 2 days that month, in 4 South for 3 days that month, in 5 Southwest for 3 days that month, in 1 Southwest for 6 days that month, in 2 South for 5 days that month, in 3 South 3 days that month, in Four southwest for 3 days that month, in 4 Southwest for 5 days that month, and 5 South for 3 days that month.

197.    Despite BOC being mandated to provide and explain this data, **DEFENDANT FRAGE** stated, "There are various reasons why they wouldn't go out," and "Depending on the time of day, it could be security risks, concerns with callouts and things of that nature that we have to address."

198.    A BOC member stated that, "Specifically with regarding recreation we know it's not being afforded on a daily basis and we don't have a plan from the Department from what they're going to do about that."

199.    The Department of Corrections representative insisted that the Board should "send a letter" with their concerns.

200.    A Board of Correction member responded that she had "already sent a letter regarding this particular issue asking what the Department's plan is with respect to recreation and I haven't seen a response."

201. In the October 14, 2025 meeting of the NYC Board of Correction, Vice Chair Skipper of the BOC chastised the Department for failing to provide specific answers to the Board's questioning about access to recreation in OBCC. https://www.nyc.gov/assets/boc/downloads/pdf/October-14-2025-Public-Meeting-Minutes-Final.pdf.

202. **DEFENDANT FRAGE** acknowledged the problem, and cited a new memo that required justification and approval from senior leadership on recreation limitations and limits shift reducing.

203. At the October 14, 2025 public meeting, the NYC Board of Correction unanimously passed a resolution stated in part:

> "WHEREAS, on September 30, 2025, the Board followed up on requests made prior to and during the September public meeting for the Department's long-term plan for consistently providing daily recreation in the Otis Bantum Correctional Center ("OBCC"). The Board also requested a copy of a standardized "tracking form" and facility-wide memo referenced by the Department, its staffing plan to address access to recreation concerns and specific details about "a tracking plan to come into compliance," yet the Board has not received any of the specific information and documentation requested; […]
>
> WHEREAS, the Board has repeatedly requested detailed plans or additional information on basic operational practices or improvements the Department intends to undertake, and, in return, has consistently received vague assertions of future plans, are referred to external resources that lack fulsome explanations sought by the Board, or are provided a minimum amount of information devoid of significant details that would allow the Board to meaningfully assess the Department's efforts of improving the operations and conditions of the City's jails; […]
>
> WHEREAS, this continued pattern of non-responsiveness undermines the Board's ability to exercise effective oversight and ensure compliance with Minimum Standards, delays urgent investigations, obstructs the Board's statutory duties, and raises serious concerns about transparency, accountability, and institutional integrity;
>
> NOW, THEREFORE, BE IT RESOLVED that:

1. The Board formally condemns the Department's ongoing failure to fully and promptly respond to the Board's requests for information and documentation regarding basic jail operations and matters that impact all who work and live in the City's jails, which represents a breach of the Department's legal obligations and a fundamental obstruction of independent oversight;

2. The Board demands immediate and sustained corrective action by the Department, including the designation of a high-level liaison to ensure timely and complete responses to all Board inquiries and information requests.

3. The Board demands that the Department immediately provide all specific documentation and detailed plans requested by the Board regarding access to recreation in OBCC and other topics highlighted in the Board's September 19, 2025 letter to the Department, as required by New York City Charter § 626(c)(2);" https://www.nyc.gov/assets/boc/downloads/pdf/2025.10.14-Resolution-on-DOC-responsiveness-concerns.pdf.

204. At all times relevant, **DEFENDANT MAGINLEY-LIDDIE** and Department of Corrections leadership were aware that OBCC did not, and does not, have indoor exercise facilities.

205. **DEFENDANT MAGINLEY-LIDDIE** and Department of Corrections leadership were aware that without access to outdoor recreation, those within OBCC did not receive meaningful access to exercise.

206. **DEFENDANT MAGINLEY-LIDDIE** and Department of Corrections leadership were aware of failure to provide recreation access or exercise access at Rikers.

207. **DEFENDANT MAGINLEY-LIDDIE** and Department of Corrections leadership were aware that the egregious lack of access to exercise was meaningfully harming the physical and mental health of those were incarcerated in OBCC.

208. **DEFENDANT MAGINLEY-LIDDIE** and Department of Corrections leadership were aware of the persistent pattern and practice of recreation assignments not being staffed, and those DOC officials who were assigned to recreation staffing being pulled away to other assignments,

resulting in incarcerated people not receiving even a bare minimum of access to recreation or exercise.

209. As a result of this unconstitutional policy and practice, Plaintiffs and the putative class members suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

210. As a direct and proximate result of **DEFENDANT CITY's** policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

211. Because individual Defendants' injurious conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

212. **DEFENDANT CITY** is further liable to Plaintiffs and putative class members because the conduct described herein was implemented pursuant to formal and/or written and/or official policies, procedures, plans, and administrative directives issued to DOC staff by **DEFENDANT CITY's** policymakers and/or agents, including Mayor Eric Adams.

213. **DEFENDANT CITY'S POLICYMAKERS**, including **DEFENDANT MAGINLEY-LIDDIE** and **DEFENDANT ROTHWELL**, and **DEFENDANT BARNABY**, were responsible for implementing and enforcing policies and procedures on behalf of the **DEFENDANT CITY**.

214. **DEFENDANT CITY** is further liable to Plaintiffs and putative class members because its policymakers, **DEFENDANTS MAGINLEY-LIDDIE, DEFENDANT ROTHWELL, and DEFENDANT BARNABY**, in the scope of their performance of their roles as policymaking agents of **DEFENDANT CITY**, designed, implemented, enforced, approved, and/or directed the practices described herein.

215. **DEFENDANT CITY** is further liable to Plaintiffs and putative class members because the conduct described herein was so widespread as to create a *de facto* policy and practice of **DEFENDANT CITY**'s DOC.

216. The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including, but not limited to:

a. Severely, and at times entirely, limiting access to out-of-cell exercise and recreation for incarcerated people in OBCC.

b. Removing DOC staff from recreation posts and failing to provide replacement staff, resulting in incarcerated people not receiving recreation.

c. Failing to adequately respond to oversight bodies, including the Board of Corrections, when they raise repeated serious concerns about lack of access to recreation or out-of-cell exercise.

d. Allowing DOC staff members to "cancel" recreation for specific units without approval or permission from DOC leadership.

e. Falsifying recreation records to obfuscate a failure to provide or offer recreation, and failing to discipline DOC staff members who falsified such records.

f. Failing to adequately respond grievances from incarcerated people regarding lack of access to recreation.

g. Failing to discipline DOC staff members who did not provide scheduled recreation.

h. Failing to discipline DOC staff members who plainly falsified logbooks to indicate that recreation was not requested.

i. Falsely characterizing grievances about a lack of recreation as unsubstantiated when in fact recreation had not been provided.

j. Failing to respond to grievances about a lack of recreation in any meaningful way, and solely forwarding substantiated grievances to the Tour Commander.

k. Engaging in inaccurate or wholly absent internal recordkeeping and public reporting related to DOC staffing and absenteeism.

217. All of the wrongful acts or omissions complained of herein were carried out pursuant to:

a. Formal policies, rules, and procedures of **DEFENDANT CITY**;

b. Actions and decisions by **DEFENDANT CITY**'s policymaking agents including, but not limited to **DEFENDANTS MAGINLEY-LIDDIE**, **DEFENDANT ROTHWELL, DEFENDANT BARNABY,** and Mayor Eric Adams;

c. Customs, practices, and usage of the DOC that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by **DEFENDANT CITY**'s agents and/or policymaking officials;

d. **DEFENDANT CITY**'s deliberate indifference to Plaintiffs' rights secured by the Fourteenth of the United States Constitution, as evidenced by the **DEFENDANT CITY**'s failures, and the failures of the **DEFENDANT CITY**'s policymaking agents, to train, supervise, and discipline DOC officers, despite full knowledge of the officers' wrongful acts, as described herein.

218. Accordingly, pursuant to *Monell v Dep't. of Social Svcs.*, (436 U.S. 658 [1978]) and the rights guaranteed to Plaintiffs and those similarly situated under the United States Constitution, **DEFENDANT CITY** is liable for the harms suffered and injuries sustained as a result of the policies and practices described herein.

## SECOND CLAIM FOR RELIEF

### Municipal Liability for Failure to Train and/or Supervise Resulting in Deficient Conditions of Confinement

*Against **DEFENDANT CITY** Pursuant to 42 U.S.C. § 1983 and **Monell v. Department of Social Services** (436 U.S. 658 [1978]) and the Fourteenth Amendment to the United States Constitution*

219.    **PLAINTIFFS** hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

220.    **DEFENDANT CITY**, by its policymaking agents, employees, and/or officials, had knowledge of the conditions giving rise to harm and injuries to **PLAINTIFFS** and those similarly situated and the instant claims but failed to act to mitigate the dangers posed to them.

221.    **DEFENDANT CITY**, by its policymaker agents, have long been on notice that the conditions in its jails amount to constitutional violations of the rights of detained people, and that these conditions pose real threats to the health of individuals such as **PLAINTIFFS**, and those similarly situated. Plaintiff incorporates the findings, reports, records, recommendations, and orders in *Nuñez et al. v City of New York* (11CV-5845) (LTS) (THK) (S.D.N.Y.) by reference.

222.    On November 26, 2024, Hon. Judge Laura T. Swain held Defendant City and its DOC in contempt for repeated violations of the Court's orders. (Dkt. 806).

223.    Defendants, including **DEFENDANTS CITY**, are well-aware that segregated confinement, and the attendant issue of lack of recreation, pose a specific safety threat to the people incarcerated in their custody, including **PLAINTIFFS** and those similarly situated,

224.    **DEFENDANT CITY**, by its policymakers and agents, including the Department of Correction Commissioner, knew that DOC staff would benefit from training or supervision to address:

a. That providing regular recreation was a non-optional requirement of DOC's obligations under both the Constitution and DOC's minimum standards;

b. That there was no training or supervision to ensure that recreation would still be provided when DOC member staff assignments were shifted;

c. That DOC members should be disciplined for failing to provide recreation;

d. That all incarcerated people on Rikers were entitled to access to recreation, and that there were not units in which recreation was "not allowed."

e. That staff members providing recreation were required to approach all cells in a unit to offer recreation, and were required to announce recreation with a bull horn.

225. Despite clear and recurring notice of the insufficiency of **DEFENDANT CITY's** training and/or supervision of staff in these scenarios, **DEFENDANT CITY** failed to address these specific training deficiencies.

226. Furthermore, Policymakers failed to provide supervision, oversight, or direction to identify these problems and assist in preventing the recurring deprivation of recreation time.

227. **DEFENDANT CITY**'s policymaking agents including, but not limited to **DEFENDANTS MAGINLEY-LIDDIE**, **DEFENDANT ROTHWELL, DEFENDANT BARNABY** failed to supervise, address, or discipline DOC members despite being on notice when they had a pervasive pattern and practice of falsifying logbooks to obfuscate that recreation was not provided to units.

228. The **DEFENDANT CITY**'s failure to address the training deficiency led to a violation of the constitutional rights of the **PLAINTIFFS** as the failure in training led to a failure to ameliorate

or mitigate the dangers posed to incarcerated individuals, such as **PLAINTIFFS** and those similarly situated.

229. The failure in training led to constitutional harms including the failure to properly apply the requirements of segregated confinement and to ensure proper out-of-cell and recreation time.

230. The **DEFENDANT CITY**'s failure to address the supervisory deficiencies led to a continuation of the failure to ameliorate or mitigate the dangers posed to incarcerated individuals, such as **PLAINTIFFS** and those similarly situated.

231. The failure in supervision led to constitutional harms including the failure to ensure its officers were properly applying the requirements of segregated confinement and to ensure proper out-of-cell and recreation time for the Plaintiffs and those similarly situated.

232. As a result of Defendants' acts and omissions, **PLAINTIFFS**, and those similarly situated, sustained the injuries complained of herein.

## THIRD CLAIM FOR RELIEF

**Violations of the Humane Alternatives to Long-Term (HALT) Solitary Confinement Act and related provisions of NY Corr. Law § 137**

### *Against All Defendants on Behalf of All Class Members*

233. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

234. In March 2021, the Humane Alternatives to Long-Term (HALT) Solitary Confinement Act went into effect in New York State. Among other changes to New York State's Correctional Law (NY Corr. Law) § 137, the amendments under the HALT Act prohibited the imposition of scheduled segregated confinement, defined generally as greater than seventeen (17) hours of cell confinement a day, without stringent due process protections.

235. The text and legislative intent of the HALT Solitary Act was to limit the use of solitary confinement and mandate statewide minimum standards for daily access to out-of-cell activities, including daily access to recreation or out-of-cell exercise.

236. The HALT Solitary Act creates a statewide floor that functionally requires a minimum of one hour of recreation or out-of-cell exercise per day.

237. The HALT Solitary Act concedes that some out-of-cell time can be limited in specific enumerated instances, but those limitations must never fall below a basic floor.

238. These restrictions on out-of-cell time can occur with residential rehabilitation units and segregated confinement.

239. Even in the more restrictive residential rehabilitation units and segregated confinement units, there is a minimum requirement of one hour of recreation per day.

240. **DEFENDANTS** failed to ensure even one (1) hour of recreation time to **PLAINTIFFS**, thereby failing to adhere even to the more restrictive conditions permitted under New York law for those properly adjudicated to placement in segregated confinement.

241. The HALT Solitary Act mandates that those in segregated confinement or residential rehabilitation units must receive at least a minimum of one hour recreation per day.

242. The HALT Solitary Act mandates that if someone in segregated confinement commits various enumerated acts, they must receive at least a minimum of two hours of recreation per day.

243. Defendants knowingly, willfully, and/or recklessly limited access to out-of-cell exercise or recreation of Plaintiffs and putative class members in violation of HALT.

244. **PLAINTIFFS** and those similarly situated, are among the class for whose particular benefit the statute was enacted.

245. Recognition of a private right of action under this section promotes the legislative purpose,

is consistent with the legislative scheme, and is necessary to ensure enforcement.

246. New York State law recognizes the creation of a private right of action under the New York State Correction law.

247. A damages remedy here is necessary to effectuate the purposes of the New York State Correction Law, including its amendments pursuant to the HALT Solitary Confinement Act.

## FOURTH CLAIM FOR RELIEF

### Substantive Due Process Violations (Unauthorized Punishment)

***Against All Defendants Pursuant to 42 U.S.C.§ 1983, the Fourteenth Amendment of the United States Constitution and Against Defendant City Pursuant to Monell v. Dep't of Social Svcs., 436 U.S. 658 (1978)***

248. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

249. Under the Due Process Clause, pretrial detainees and/or people under parole supervision who have not been adjudicated to be in violation of the terms of their parole may not be punished prior to an adjudication of guilt in accordance with due process of law.

250. At the time of their confinement in 2025, Plaintiffs were each pretrial detainees.

251. Limiting opportunities for out-of-cell exercise or recreation may be imposed upon pretrial detainees and/or people under parole supervision who have not been adjudicated to be in violation of the terms of their parole only for a legitimate governmental purpose and not for the purpose of punishment.

252. Even assuming a legitimate, non-punitive regulatory purpose existed, imposing the conditions of isolation confinement set forth above was plainly excessive in relation to such purpose.

253. **DEFENDANT CITY's** policy and practice described herein was intended to punish and/or had the effect of punishing Plaintiffs and the putative class members.

254. Detained people were detained at Rikers Island under Defendants' functional bar on recreation or out-of-cell exercise at the whim of DOC staff and/or DOC policymakers, with such determinations based upon malice, dislike, caprice, retaliation, and/or ill-will, and absent due process, in an effort to punish these individuals.

255. By functionally barring any regular out-of-cell recreation or exercise to Plaintiffs and the putative class members for reasons that were not reasonably related to any legitimate interest in maintaining order in the facility, **DEFENDANT CITY** punished Plaintiffs and the putative class members in violation of their Fourteenth Amendment right to be free from punishment as pretrial detainees.

256. As a result of this unconstitutional policy and practice, Plaintiffs and the putative class members suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

257. As a direct and proximate result of **DEFENDANT CITY's** policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

258. Because individual Defendants' injurious conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

259. **DEFENDANT CITY** is further liable to Plaintiffs and putative class members because the conduct described herein was implemented pursuant to formal and/or written and/or official policies, procedures, plans, and administrative directives issued to DOC staff by **DEFENDANT CITY's** policymakers and/or agents.

260. **DEFENDANT CITY'S POLICYMAKERS**, including **DEFENDANT MAGINLEY-LIDDIE, DEFENDANT ROTHWELL**, and **DEFENDANT BARNABY** were responsible for implementing and enforcing policies and procedures on behalf of the **DEFENDANT CITY**.

261. **DEFENDANT CITY** is further liable to Plaintiffs and putative class members because its policymakers, **DEFENDANT MAGINLEY-LIDDIE, DEFENDANT ROTHWELL**, and **DEFENDANT BARNABY** in the scope of their performance of their roles as policymaking agents of **DEFENDANT CITY**, designed, implemented, enforced, approved, and/or directed the practices described herein.

262. **DEFENDANT CITY** is further liable to Plaintiffs and putative class members because the conduct described herein was so widespread as to create a *de facto* policy and practice of **DEFENDANT CITY**'s DOC.

263. The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including, but not limited to:

    a. Implementing punitive scheduled solitary confinement exceeding 24-hours without due process as guaranteed under state law and DOC regulations;

    b. Engaging in inaccurate or wholly absent internal recordkeeping and public reporting related to DOC staffing, absenteeism, safety protocol compliance, environmental inspections, injuries, and illnesses in New York City jails.

264. All of the wrongful acts or omissions complained of herein were carried out pursuant to:

    a. Formal policies, rules, and procedures of **DEFENDANT CITY**;

    b. Actions and decisions by **DEFENDANT CITY**'s policymaking agents including, but not limited to **DEFENDANT MAGINLEY-LIDDIE, DEFENDANT ROTHWELL**, and **DEFENDANT BARNABY;**

c.  Customs, practices, and usage of the DOC that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by **DEFENDANT CITY**'s agents and/or policymaking officials;

d.  **DEFENDANT CITY**'s deliberate indifference to Plaintiffs' rights secured by the Fourteenth Amendment of the United States Constitution, as evidenced by the **DEFENDANT CITY**'s failures, and the failures of the **DEFENDANT CITY**'s policymaking agents, to train, supervise, and discipline DOC officers, despite full knowledge of the officers' wrongful acts, as described herein.

265.  Accordingly, pursuant to *Monell v Dep't. of Social Svcs.*, (436 U.S. 658 [1978]) and the rights guaranteed to Plaintiffs and those similarly situated under the United States Constitution, **DEFENDANT CITY** is liable for the harms suffered and injuries sustained as a result of the policies and practices described herein.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**Procedural Due Process Violations**

*Against All Defendants Pursuant to 42 U.S.C.§ 1983 and the Fourteenth Amendment of the United States Constitution and Against Defendant City Pursuant to* <u>Monell v. Dep't of. Social Svcs.</u>*,* <u>436 U.S. 658 (1978)</u>

266.  Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

267.  By its policy and practice described herein, **DEFENDANT CITY** authorized the placement of Plaintiffs and the putative class members in units with indefinite lack of access to recreation without adequate process, violating the Due Process Clause of the Fourteenth Amendment.

268. Plaintiffs have a liberty interest in avoiding overly and needlessly restrictive conditions confinement. This liberty interest arises from both the Due Process Clause of the Fourteenth Amendment and from an expectation and interest created by state and city laws and regulations, including without limitation those discussed above.

269. By placing Plaintiffs and the putative class members indefinitely in units that lack access to exercise without regard for the appropriateness of such confinement and without adequate process, **DEFENDANT CITY** violated the right of Plaintiffs and the putative class members to due process.

270. Neither Plaintiffs nor the putative class members were afforded any pre- or post- placement hearing before or after being placed in units that denied access to exercise, during which it was determined that continued placement in such confinement was reasonably necessary for a legitimate purpose.

271. As a result of this unconstitutional policy and practice, Plaintiffs and the putative class members have suffered and continue to suffer physical, psychological, mental, and/or emotional injuries, as well as loss of liberty.

272. As a direct and proximate result of **DEFENDANT CITY**'s policy and practice, Plaintiffs and the putative class members suffered damages in an amount to be proven at trial.

273. Because individual Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

274. As described elsewhere herein, **DEFENDANT CITY** is liable for the harms suffered and injuries sustained by Plaintiffs and those similarly situated pursuant to *Monell v Dep't of Social Svcs.*, (436 U.S. 658 [1978]), because the acts and omissions described herein undertaken by

Defendants agents and/or policymakers and/or employees were so binding, widespread, formal, and/or pervasive in nature as to constitute policies and practices of **DEFENDANT CITY**.

275. Because **DEFENDANT CITY** is liable pursuant to *Monell v Social Svcs.*, **DEFENDANT CITY** is liable for the harms suffered and injuries sustained by Plaintiffs and those similarly situated.

**<u>SIXTH CLAIM FOR RELIEF</u>**
**Negligence**
*Against the City of New York by its DOC Agents and/or Employees*

276. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

277. **DEFENDANT CITY**, by its DOC agents and/or employees, owed a special duty to Plaintiffs and breached this duty through their conduct described herein.

278. Under New York State law, **DEFENDANT CITY** is responsible for the acts and/or omissions of its employees and/or agents as described herein pursuant to the doctrine of *respondeat superior*.

279. **DEFENDANT CITY, DEFENDANT MAGINLEY-LIDDIE, DEFENDANT ROTHWELL**, and **DEFENDANT BARNABY** all failed to adequately supervise DOC staff to ensure adequate escorts and staffing to facilitate mandated out-of-cell exercise and recreation.

280. This negligence of **DEFENDANT CITY's** employees and/or agents consisted, *inter alia*, of gross negligence in supervision; negligence in adherence to existing Department of Correction protocol; deprivation of Plaintiffs' civil rights, privilege and immunities secured under the Constitution of the United States of America and State of New York; and negligence in failing to use care in performance of duties for which a reasonably prudent and careful individual in Defendants' respective position would have used in similar circumstances.

281. The harms caused to **PLAINTIFFS**, and all those similarly situated, were foreseeable and caused by the negligence of **DEFENDANTS**.

282. The applicable standards, rules, protocols, and procedures **DEFENDANTS** failed to adhere to include, but are not limited to:

    a. DOCCS Minimum Standards PART 7028, which requires "exercise periods which, at the discretion of the chief administrative officer, shall consist of: (1) at least 1 1/2 hours during each of five days per week; or (2) at least one hour seven days a week." which must be outdoors except for inclement weather;

    b. NYC Board of Correction Minimum Standards, Title 40 § 1-06 Recreation, which states, "Recreation periods shall be at least one hour; only time spent at the recreation area shall count toward the hour. Recreation shall be available seven (7) days per week in the outdoor recreation area, except in inclement weather when the indoor recreation area shall be used."

283. Defendants' negligence in fulfilling their duty resulted in Plaintiffs' injuries, and Defendants are liable to Plaintiffs for damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

    a. Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23;

    b. Enter a judgment declaring that Defendant has committed the violations of law alleged in this action;

    c. Award compensatory damages in an amount to be determined for all physical, psychological, mental, and emotional injuries, as well as loss of liberty, sustained by

Plaintiffs and the class as a result of the policies and practices alleged herein, together with interest as allowed by law;

d. Award punitive damages;

e. Award reasonable attorneys' fees, together with the costs of this action; and

f. Grant such other further relief as the Court may deem appropriate.

Dated:     August 5, 2026
           Brooklyn, New York

**KAISHIAN & MORTAZAVI LLC**

By:     _____
Maryanne K. Kaishian, Esq.
S. Masoud Mortazavi
Callen Lowell
55 Washington Street, Ste. 461
Brooklyn, New York 11201
(347) 662-2421
eservice@kaishianlaw.com

Wylie Stecklow PLLC
Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019
(212) 566 8000
ECF@WylieLAW.com

*Attorneys for Plaintiffs and the Putative Class*